MARCEL L. BILODEAU

*vs.*

MAINE EMPLOYMENT SECURITY COMMISSION

AND

CONTINENTAL MILLS

\* \* \* \*

ROLAND E. GERMAIN

*vs.*

MAINE EMPLOYMENT SECURITY COMMISSION

AND

BATES MANUFACTURING COMPANY

\* \* \* \*

ISIDORE SHABAN

*vs.*

MAINE EMPLOYMENT SECURITY COMMISSION

AND

PEPPERELL MANUFACTURING CO.

Kennebec. Opinion, November 21, 1957.

*Berman, Berman & Wernick,* for plaintiff.

*Milton L. Bradford,* for Commission.

*Skelton & Mahon,* for Continental Mills.

*Baston, Snow, Rice & Boyd and*
*Maurice Roux,* for Pepperell Mfg. Co.

SITTING: WILLIAMSON, C. J., WEBBER, BELIVEAU, TAPLEY, SULLIVAN, DUBORD, JJ.

TAPLEY, J. On report. These cases are reported from the Superior Court for Kennebec County, with stipulation by all the parties that they be considered together as the issues in all three cases are the same. The claimants are employed as laborers in the Bates Manufacturing Company, Continental Mills and Pepperell Manufacturing Co. respectively. The Textile Workers Union of America (C.I.O.) represents the claimants for purposes of collective bargaining and had signed collective bargaining agreements with the three companies. In February of 1955 the three Maine companies notified the Textile Workers Union of their desire to terminate the contracts and thereafter negotiations were undertaken with the ultimate purpose in mind of agreeing on new contracts. Proposals were made on the

one side and the other and finally, on May 1, 1955, Bates Manufacturing Company abandoned its demand for a 10c an hour wage cut and accepted the terms and conditions of the contract which had previously been in force and claimant Germain and the other employees at Bates resumed work on May 2, 1955.

Continental Mills, on May 13, 1955, agreed to accept the previous year's contract and Bilodeau and fellow workmen began work at the Continental on May 16, 1955.

The Pepperell Manufacturing Company remained firm in its wage and hour demands until July 15, 1955 when it also agreed to the terms of the previous year's contract and Mr. Shaban went to work on July 15, 1955.

We shall consider only Mr. Bilodeau's claim as the factual questions and problems of law in each case are substantially the same.

Mr. Bilodeau was employed by the Continental Mills as a Barber-Coleman spooler. He seeks compensation benefits from April 17th to May 14th, 1955. On April 18, 1955 he made application for unemployment compensation which resulted in the finding evidenced by a deputy's decision that "it is decided that your unemployment was due to a stoppage of work because of the labor dispute at the place you were last employed, and that you belong to the grade and class of workers who participated in or who were directly interested in the labor dispute, and you are disqualified for benefits in the period indicated above." The deputy's decision was appealed to the Appeal Tribunal which affirmed the decision of the deputy and this decision in turn was reviewed by the Employment Security Commission. The Employment Security Commission approved the action of the Appeal Tribunal, with one member dissenting.

The Commission based its decision on the provisions of Sec. 15, Subsec. IV of the Employment Security Law as ap-

plied to its findings of fact. The Commission in its decision decided other issues which it considered not pertinent to the disqualification provisions because of the rule laid down in *Dubois and Remillard* v. *Maine Employment Security Commission*, 150 Me. 494, which requires the Commission "to determine all of the issues which are properly and adequately raised by the evidence." According to the Commissioners' decision, the claimant was not entitled to unemployment compensation because the circumstances and facts were such that they worked to his disadvantage in that they disqualified him for benefits under provisions of Sec. 15, Subsec. IV. The Maine Employment Security Law disqualifies individuals for benefits if they come within certain prescribed circumstances:

> "IV. For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided that this subsection shall not apply if it is shown to the satisfaction of the commission that:
>
> > "A. He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
> >
> > "B. He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute;
>
> "Provided that if in any case separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment or other premises."

The Commission decided that the claimant was not entitled to relief because his activities were such in connection with his employer and the Union that he disqualified himself from receiving benefits. We shall first consider the question as to whether the Commission erred in deciding that the claimant was not qualified to receive benefits because the circumstances of his case were found to be within the category of Sec. 15, Subsec. IV. This section sets out what acts or conditions cause disqualification of an individual. The individual is disqualified if the unemployment is due to a stoppage of work caused by a labor dispute where the individual was last employed. These terms of disqualification do not apply, however, if it can be shown to the satisfaction of the Commission that:

"A.  He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"B.  He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute;"

Claimant maintains that Sec. 15, Subsec. IV becomes a nullity as the circumstances of the case fall within the meaning and intent of Sec. 15, Subsec. III-B, and that the Commission committed legal error in finding Subsec. III-B of Sec. 15 "not applicable to this case." This Subsec. III-B reads:

"B.  Notwithstanding any other provisions of this chapter no work shall be deemed suitable and benefits shall not be denied under the provisions of this chapter to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

"1.  If the position offered is vacant due directly to a strike, lockout, or other labor dispute;

"2. If the wages, hours or other conditions of work are substantially less favorable to the individual than those prevailing for similar work in the locality;

"3. If as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization."

It was the obvious intention of the Legislature in enacting Subsec. IV of Sec. 15 to make a rule which would govern the payment of benefits to individuals who found themselves without employment because of stoppage of work occasioned by a labor dispute. The first paragraph of Subsec. IV provides the individual is entitled to no benefits if the Commission finds that the unemployment is due to a stoppage of work caused by a labor dispute. It is apparent that the Legislature understood there would be cases whereby an employee would suffer loss of employment income as a result of the stoppage of work because of a labor dispute wherein he had no participation, either directly or indirectly. Under these circumstances the Legislature, not desiring to unjustly withhold benefits from an employee, established exceptions to the general rule so that even though the work stoppage was caused by a labor dispute, the employee who did not participate in the financing or was not directly interested in the labor dispute which caused the stoppage of work could receive benefits. The exceptions provide that he must not belong to a grade or class of workers which were participating in financing or directly interested in the dispute. The Legislature has said in words of unmistakable meaning that if the employee loses his employment and income incident thereto because of a work stoppage caused by a labor dispute and he actively participates in this labor dispute, he is not entitled to receive employment compensation as a result of the stoppage of work occasioned by the dispute. On the other hand, if he suffers loss of income because of the work stoppage and is free of participation in

the labor dispute causing it, he should be permitted to qualify for unemployment benefits.

We now consider the facts of the Bilodeau situation which are to be interpreted in the light of Sec. 15, Subsec. IV in order to determine the validity of Mr. Bilodeau's claim. The statute uses the phrase "stoppage of work." There are a number of definitions of words given in the Maine Employment Security Law but we find none defining "stoppage of work." There have been definitions of the term established in other jurisdictions. The term "stoppage of work" refers generally to a cessation of plant operations. *Ablondi, et al.* v. *Board of Review* (Superior Ct. App. Div.), 73 A. (2nd) 262 (N. J.) ; *Great A. & P. Tea Company* v. *New Jersey Dept. of Labor and Industry,* etc. (Superior Ct. App. Div.), 101 A. (2nd) 573 (N. J.). The State of New Jersey has in its Unemployment Compensation Act a provision practically identical to Sec. 15, Subsec. IV of the Maine Law. In the case of *Gerber* v. *Board of Review,* etc. (Superior Ct. App. Div.), 115 A. (2nd) 575 (N. J.), the question of definition of the term "labor dispute" arose. The court said on page 578:

> "The term broadly includes any controversy concerning terms or conditions of employment or arising out of the respective interests of employer and employee."

It is interesting to note that the *Gerber* case involved a labor dispute occasioned by the breaking down of negotiations seeking the consummation of a labor contract between the Company and the Union.

There can be no question that the unemployment of Mr. Bilodeau was occasioned by the "stoppage of work" within the meaning of the term as used in the Act.

The "stoppage of work" is not sufficient in and of itself to deprive Mr. Bilodeau of his unemployment compensation unless this "stoppage of work" existed because of a labor

dispute at the mill. On April 15, 1953 the Union and the employer entered into a written contract, this contract to continue in force until April 15, 1955. Previous to termination date, the parties attempted negotiations of a new contract but were unsuccessful in their efforts, so on April 15, 1955 the contract terminated without replacement by a new one. There existed an inability on the part of the employer and Union to agree on conditions affecting both labor and management. In other words, there arose a dispute in which labor was vitally concerned, particularly as to fringe benefits and wages. Under these facts there existed a labor dispute which was the primary cause of the work stoppage. *Gerber* v. *Board of Review,* etc., *supra; Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 U. S., 143; *Johnson* v. *Iowa Employment Sec. Com.,* 32 N. W. (2nd) 786 (Iowa). See 28 A. L. R. (2nd) 287.

81 C. J. S., 263, Sec. 175:

> "A 'labor dispute' within the meaning of a provision rendering persons unemployed because of a labor dispute ineligible for unemployment benefits may exist in the absence of a labor contract. Such a dispute exists where a union and the employer are unable to agree on the terms of a contract to be entered into between them. Where an existing contract has expired or is about to expire, a dispute with respect to the terms of a new contract, or the modification of the old, constitutes a labor dispute within the meaning of the statute."

The provisions of the disqualification section (Sec. 15, Subsec. IV) are such that even though the claimant became unemployed because of a work stoppage existing on account of a labor dispute, he may still obtain unemployment benefits if he can show to the satisfaction of the Commission that:

> "A. He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and

"B. He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute;"

The claimant in order to relieve himself of disqualification has the burden of proving to the satisfaction of the Commission that he (1) did not participate in or finance or was not directly interested in the labor dispute; (2) that he did not belong to a grade or class of workers which immediately before the commencement of the stoppage of work were members employed at the premises at which the stoppage occurred, any of whom were participating in financing or directly interested in the dispute. *Wasyluk* v. *Mack Mfg. Corporation, et al.* (Superior Ct. App. Div.), 68 A. (2nd) 264 (N. J.)

Mr. Bilodeau testified, and the record demonstrates, that he was Secretary of the Continental Local and he participated in the meetings as the Secretary as well as a member. He further testified that he attended and joined in a meeting having to do with the question of acceptance of a decrease in pay and a decision to stay away from work. On the question of participation in or being directly interested in a labor dispute, the record discloses the following questions addressed to Mr. Bilodeau and his answers:

"Q. Now, whether or not, of your own knowledge, as a member of the local union, as a member of the International union, as a secretary of the local union at the Continental, you all went out from your employment on a 'No contract, no work' basis?

A. Yes.

Q. That is correct, isn't it?

A. Yes."

There appears no question that the claimant participated and was directly interested in the labor dispute which caused a stoppage of work and by no conceivable stretch of the imagination does he come within the exceptions which would permit him to receive unemployment benefits.

The claimants strongly urge that this case should be determined under Sec. 15, Subsec. III-B-1, as this subsection in the light of the facts applies and, in effect, nullifies and causes to be ineffectual the provisions of Sec. 15, Subsec. IV.

The Commission in considering Sec. 15, Subsec. III-B-1, found:

> "It seems obvious to us that claimant's contention that the proposal by the Company constituted *new* work is without merit. There is no doubt in our minds that the Legislature did not intend subsection III of Section 15 to operate in direct contradiction to subsection IV of Section 15 and we conclude that subsection III, B of Section 15 is not applicable to this case."

This finding is well supported by *Barber* v. *The California Employment Stabilization Commission*, 278 P. 2d 762 (Cal.) (1955). In the *Barber* case the court was concerned with two provisions of the Unemployment Insurance Act bearing marked similarity to the provisions of the Maine law involved in the instant case. In the *Barber* case the court said on page 772:

> "If the appellants had not left their work because of the trade dispute, a sound argument could be made that they could not be deprived of benefits because they refused 'new work' made vacant because of the strike. But section 13(b) (1) has no application to situations in which section 56(a) is applicable. If the men left their work because of a trade dispute within the meaning of section 56(a), they are ineligible for benefits during the period of the strike, because the jobs thus made vacant are their jobs and not as to them 'new work.' " ****

"Under sections 56 (a) and 13 (b) (1) an employee cannot be denied benefits because he refuses to become a strike breaker, but that rule does not apply to work in the claimant's last employment. That is not 'new work.' The work made vacant by a strike is 'new work' only to strangers to the strike. It is not 'new work' to the strikers themselves when they fall within the classification made by section 56 (a)."

The claimants' contention is without merit.

The Maine Unemployment Security Law "is designed to create a sound employment security law to encourage employers to provide more steady work, to maintain the purchasing powers of workers becoming unemployed, and thus to prevent and limit the serious social consequences of poor relief assistance." This Act was never intended to lend itself as a medium through which financial aid would be provided for the prosecution and support of a labor dispute. Such use of the Act would be against public policy.

The claimants are not entitled to receive unemployment benefits as they are disqualified under provisions of Sec. 15, Subsec. IV of Chap. 29, R. S. 1954.

The entry will be,

> *Remanded to Superior Court for entering of a decree sustaining the decree of the Commission.*