**Maurice P. BOUCHER**

v.

**MAINE EMPLOYMENT SECURITY COMMISSION.**

Supreme Judicial Court of Maine.

Argued May 12, 1983.

Decided Aug. 8, 1983.

---

Alan A. Toubman (orally), Pine Tree Legal Assistance, Inc., Presque Isle, Thomas H. Kelley, Pine Tree Legal Assistance, Portland, for plaintiff.

Peter J. Brann (orally), Asst. Atty. Gen., Maine Employment Sec. Com'n, Augusta, for defendant.

Before GODFREY, NICHOLS, ROBERTS, VIOLETTE and WATHEN, JJ., and DUFRESNE, A.R.J.

ROBERTS, Justice.

Maurice P. Boucher appeals from a judgment of the Superior Court, Aroostook County, which affirmed a decision of the Maine Employment Security Commission disqualifying him from receiving unemployment benefits. Boucher contends that a substantial reduction in pay constitutes "good cause" for terminating employment under 26 M.R.S.A. § 1193(1)(A) (Supp.1982–1983). Because we agree, we reverse the judgment of the Superior Court.

## I.

In July of 1980, Boucher was hired as a leather cutter by Viner Brothers, Inc., a shoe manufacturer. He was employed in that capacity for a year. As a leather cutter, Boucher was in Viner Brothers' highest labor grade of six, earning $4.80 per hour plus incentive pay based on his volume of piece work. Viner Brothers' Employee Handbook provided for such incentive pay. By the end of a year of employment, he was earning "close to $10.00 an hour."

In July of 1981 when Viner Brothers shut down, Boucher was laid off. Approximately two months later, Boucher was recalled from the layoff. The Employee Handbook provides that upon recall from the layoff employers will offer employees positions open in their labor grade. If no such positions are open, the employer may offer a position in the next lower labor grade. The process continues through the succeeding lower labor grades.[1] According to the Handbook, employees are obligated to accept the recall job.[2] Boucher was assigned to work "last pulling" which has a labor grade of one and which paid him minimum wage, $3.35 per hour, with no incentive pay.

On the day he returned to work, Boucher immediately complained to the foreman about the last-pulling job and the wage. Three days later he complained to the personnel manager. He also filed four written grievances complaining about the reduction in salary. Boucher complained about the job for approximately two months. When no one responded, he quit his employment on November 30, 1981.

Upon Boucher's claim for unemployment benefits, the Deputy determined that Boucher left his regular employment "vol-

---

1. INDEFINITE LAYOFFS

 .        .        .        .        .

B. Employees laid off will be placed on any open job in their department in their labor grade. If there is no open job, the employee must displace the least senior employee in the labor grade in that department.

C. If the employee is not able to remain in his labor grade, he will be placed in any open job in the next lower labor grade in the department. If there is not an open job, the employee must displace the least senior employee in that labor grade in the department. If the employee is unable to apply this procedure in the next lower labor grade, this procedure will be followed in succeeding lower labor grades if applicable. . . .

2. RECALL FROM LAYOFF

A. Employees laid off from the plant will be recalled to open jobs that they are qualified to perform and will remain in that job until recalled to their regular job. Employees are obligated to accept the recall job.

B. Job openings will be filled by recalling laid off employees before awarding any bids.

C. When employees are laid off, they will be recalled in accordance with the following procedure:

1. The employee will be called on the telephone or notified in person.

2. If the employee cannot be reached by the third day, the employee will be sent a certified letter notifying the employee of his recall.

3. If an employee fails to return to work by the end of the fifth working day after the date of mailing the notice, he will be considered as quit unless he provides an acceptable reason for his failure to report.

D. It is the employee's responsibility to maintain his correct address and phone number on file with the Company. The Company may also fill any job during the process of recall.

untarily without good cause" and thus denied him benefits. Boucher appealed the Deputy's decision to the Appeal Tribunal, which determined that the appeal was not timely. Boucher then filed an appeal with the Commission, which found that the appeal was timely.

Boucher testified at a hearing before the Commission, but no representative of the employer appeared. Framing the issue, the Commission stated that it must determine whether Boucher left his regular employment voluntarily without good cause attributable to such employment, within the meaning of 26 M.R.S.A. § 1193(1)(A). The Commission then decided that Boucher left his employment without good cause attributable to his employment because the employer had complied with the recall policy articulated in the Employee Handbook. Accordingly, the Commission reasoned that the employer was free to offer the last-pulling job to Boucher upon being recalled from the layoff. Boucher was required to accept that job although it paid him minimum wage. In addition, the Commission determined that a "mere reduction of wages" does not constitute good cause. According to the Commission, "[t]he employer must be free to structure his labor costs in a manner which will keep the business viable. Thus the employer was acting within its reasonable discretion when it assigned the claimant a job paying wages lower than he had been receiving."

## II.

■ We review the administrative record to determine whether there is any competent evidence to support the findings of the Commission. We must also determine whether within those findings the Commission has correctly applied the law. *Smith v. Maine Employment Security Commission*, 440 A.2d 1037, 1038 (Me.1982); *Tobin v. Maine Employment Security Commission*, 420 A.2d 222, 224–25 (Me.1980).

### A. *Acceptance of the Recall Job*

The Commission based its decision, in part, upon Boucher's obligation, according to the recall provision of the Employee Handbook, to accept the offered recall position. The record is unclear as to whether the Commission found that Boucher in fact accepted the last-pulling job with a labor grade of one and thus was not entitled to his former wages. *See Smith,* 440 A.2d at 1038 (record supports finding that plaintiff accepted temporary position); *Edwards v. Unemployment Compensation Board of Review,* 35 Pa.Cmwlth. 647, 650, 387 A.2d 510, 511 (1978) (general rule is that when one accepts job, he admits suitability of that job). Assuming for the purposes of this discussion that the Commission did so conclude, that ruling was erroneous.

■ The right to compensation benefits is derived from the unemployment compensation law and not from the agreement between the employer and employee. *Johns-Manville Products Corp. v. Board of Review,* 122 N.J.Super. 366, 370, 300 A.2d 572, 575 (1973); *see Therrien v. Maine Employment Security Commission,* 370 A.2d 1385, 1389 (Me.1977) (Commission erred in treating collective bargaining agreement as standard for determining whether claimant should receive unemployment benefits); *see also Moore v. Maine Employment Security Commission,* 388 A.2d 516, 519 (Me.1978) (Commission erred by ruling that violation of reasonable company rule constitutes *per se* misconduct). Consequently, the Employee Handbook provision requiring employees to accept recall jobs cannot be used as the basis for a finding that Boucher in fact accepted the recall position. Moreover, it is clear from the record that Boucher never accepted the last-pulling job. The Commission found as a fact that Boucher complained to his foreman "immediately" upon being assigned the last-pulling job. The record further demonstrates that he continued to complain; he complained to the personnel manager and filed four written complaints. When no one took any action, he left his employment. Under the circumstances, Boucher clearly did not voluntarily accept the recall position.

■ The Commission also based its decision, in part, upon the recall provision of the Employee Handbook which provides that the employer may recall Boucher to "open jobs." The record is unclear, however, as to whether the Commission concluded that as a result of that recall provision Boucher was not entitled to his former position or former wage. If the Commission based its ruling on such reasoning, it erred.

Before Boucher was laid off, he occupied a leather-cutting position which had the highest labor grade and he earned $10.00 per hour. The Employee Handbook provided that Boucher would be given a last-pulling job, the lowest labor grade, only if there were no positions available in the department in his labor grade and in every "succeeding lower labor grade." Under the recall provisions of the Handbook, therefore, Boucher had good reason to believe that upon recall he would receive his former position. When he returned to work, he discovered that he did not receive his former position as leather cutter but rather received the lowest grade job. It was only then that the change in employment conditions occurred. Under the circumstances, Boucher had no reasonable expectation of being relegated to the lowest labor grade at minimum wage. Boucher was not required to continue his employment at that reduced rate as a consequence of the terms of section 1193(1)(A). The Commission erred in concluding that under the provisions in the Employee Handbook Boucher was entitled only to whatever position the employer decided to assign to him.

This case is distinguishable from *Smith v. Maine Employment Security Commission,* 440 A.2d 1037 (Me.1982). In *Smith,* the plaintiff was a permanent employee until February of 1980 when illness forced her to leave. She returned in October of 1980 as a temporary employee. She left that employment when her foreman told her that as a temporary employee she was not entitled to the fringe benefits received by permanent employees. The Court held that by *accepting* a temporary position, Smith was neither promised nor entitled to the fringe benefits received by permanent employees. *Id.* at 1037–39.

In this case, Boucher never accepted the last-pulling position. It cannot be said therefore that he accepted the reduction in wages. Moreover, under the applicable provisions of the Employee Handbook, Boucher could have reasonably believed that upon recall he would receive his former position or a comparable one.

B. *Reduction in Pay as Good Cause*

The Commission also concluded that a "mere reduction" did not constitute good cause. In this case, the Commission found that before the layoff Boucher was earning $10.00 per hour and upon recall from the layoff was earning $3.35 per hour. This constitutes a 66.5% reduction in pay. The Commission determined that this "mere reduction" is proper because the employer is free to structure labor costs to keep his "business viable."

■ Under 26 M.R.S.A. § 1193(1)(A) (Supp.1982–1983),[3] an employee who "vol-

---

**3.** § 1193. Disqualification
An individual shall be disqualified for benefits:
1. Voluntarily leaves work.
  A. For the week in which he left his regular employment voluntarily without good cause attributable to such employment, or to a claimant who has voluntarily removed himself from the labor market where presently employed to an area where employment opportunity is less frequent, if so found by the deputy, and disqualification shall continue until claimant has earned 4 times his weekly benefit amount in employment by an employ-

er; provided no disqualification shall be imposed if the individual establishes that he left employment in good faith and accepted new employment on a permanent full-time basis and he became separated from the new employment for good cause attributable to employment with the new employing unit. Leaving work shall not be considered voluntary without good cause when it is caused by the illness or disability of the claimant or of his immediate family and the claimant took all reasonable precautions to protect his employment status by having promptly notified his employer as to the reasons for his ab-

untarily without good cause" terminates his employment is not entitled to receive unemployment benefits. *See Therrien,* 370 A.2d at 1389–90. It is clear that mere dissatisfaction with wages generally does not constitute "good cause." *Smith,* 440 A.2d at 1039 (citations omitted). We have not to date determined whether a substantial reduction in pay constitutes good cause under 26 M.R.S.A. § 1193(1)(A). *See id.* at 1039 n. 4 (we did not determine conditions under which changes in terms of employment made unilaterally by employer may constitute "good cause" within meaning of section 1193(1)(A)). In *McAllister v. Maine Department of Manpower Affairs and Colonial Coach Estates,* No. CV–78–465 (Me.Super.Ct.Ken.Cty., Mar. 21, 1979), the Superior Court held that a significant reduction in the claimant's compensation falls within the ambit of the term "good cause." Under the weight of authority, a substantial reduction in pay constitutes "good cause." *See Bunny's Waffle Shop v. California Employment Commission,* 24 Cal.2d 735, 743, 151 P.2d 224, 228 (1944) (25% reduction); *International Spike, Inc. v. Kentucky Unemployment Insurance Commission,* 609 S.W.2d 374, 377 (Ky.App.1980) (21% to 32% salary reductions); *Scott v. Photo Center, Inc.,* 306 Minn. 535, 536, 235 N.W.2d 616, 617 (1975) (per curiam) (25% reduction); *Johns-Manville Products Corp.,* 122 N.J.Super. at 367–71, 300 A.2d at 573–75 (reduction in wage rate from $4.17 to $3.21); *Edwards,* 35 Pa. Cmwlth. at 647–50, 387 A.2d at 510–11 (50% reduction); *LaRose v. Department of Employment Security,* 139 Vt. 513, 515, 431 A.2d 1240, 1242 (1981) (40% reduction); *see generally* Annot., 95 A.L.R.3d 449 (1979).

sence and by promptly requesting reemployment when he is again able to resume employment; nor shall leaving work be considered voluntary without good cause if the leaving was necessary for the claimant to accompany, follow or join his spouse in a new place of residence and he can clearly show within 7 days upon arrival at the new place of residence an attachment to the new labor market and is in all respects able, available and actively seeking suitable work....

▪ Boucher had a skill level which earned him approximately $10.00 per hour before the layoff. Upon recall, Boucher was asked to accept wages of $3.35 per hour. Under the circumstances of this case, a 66.5% unilateral reduction in pay constitutes good cause within section 1193(1)(A). The Commission erred in ruling that Boucher's new rate of pay was a "mere reduction of wages" which did not constitute "good cause."[4] He is, therefore, entitled to unemployment benefits.

The entry is:

Judgment reversed.

Case remanded to the Superior Court for entry of an order reversing the decision of the Commission.

GODFREY, NICHOLS, VIOLETTE, JJ., and DUFRESNE, A.R.J., concur.

WATHEN, Justice, dissenting.

I must respectfully dissent. The Court acknowledges that dissatisfaction with wages does not generally constitute "good cause" and yet undertakes the task of distinguishing those situations in which the employee has received a "substantial reduction" in wages. It is difficult to imagine a line that is more difficult to draw in the absence of any statutory guidance. The difficulties inherent in such a task are further compounded when, as in the present case, the comparison is made between total compensation, including incentive pay, and the basic wage rate paid after return to work.

It is my view that the majority has ventured beyond interpreting the language of the statute and has reached a result which does not clearly serve any expressly defined

4. The suitability provision of § 1193(3) which applies when the claimant refuses to accept an offer of suitable employment with a different employer is governed by a different standard involving considerations of length of unemployment and prospects of securing work. *Grace v. Maine Employment Security Commission,* 398 A.2d 1233 (Me.1979).

purpose of the Maine Employment Security law. As this Court stated in *G.H. Bass and Co. v. Maine Employment Security Commission,* 250 A.2d 492, 496 (Me.1969):

We must not, under the guise of a liberal interpretation and construction of the Act, extend its provisions beyond the legitimate goals which it was enacted to attain. The Legislature never intended it to be a health and accident measure, *Toothaker v. Maine Employment Security Commission, supra,* at page 206; nor that it should lend itself as a medium through which financial aid would be provided for the prosecution and support of a labor dispute, *Bilodeau et al. v. Maine Employment Security Commission, et al.,* 1957, 153 Me. 254, 264, 136 A.2d 522; nor that it should underwrite one's private venture in self-employment, *Ham v. Maine Employment Security Commission,* 1966, Me., 216 A.2d 866; nor that it should be considered as a form of pension, *Richardson v. Maine Employment Security Commission,* 1967, Me., 229 A.2d 326.

I would add that neither should the law be used to maintain a particular wage rate, a particular level of incentive pay, overtime, or fringe benefit. I would affirm the judgment of the Superior Court.